IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FAGALE S. GRANT,                           )
                                           )
                Plaintiff,                 )
                                           )
v.                                         )        CASE NO. 2:19-cv-58-JTA
                                           )
ELMORE COUNTY BOARD                        )        (WO)
OF EDUCATION, et al.,                      )
                                           )
                Defendants.                )

## MEMORANDUM OPINION AND ORDER

Plaintiff Fagale S. Grant filed this employment discrimination action alleging the Elmore County Board of Education and the Superintendent of Education for Elmore County discriminated against her based upon race, disability, and age.  The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Docs. No. 19, 20.)

This matter is before the Court on Defendants' Joint Motion for Summary Judgment with supporting brief and evidentiary submissions (Docs. No. 50, 51, 52), Plaintiff's responsive brief in support with evidentiary submissions (Doc. No. 57), and Defendants' reply thereto (Doc. No. 58).  The motion is ripe for review.

After careful review, the Court concludes that the motion for summary judgment is due to be GRANTED.

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case."  *McGee v. Sentinel Offender Servs., LLC,* 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Factual assertions must cite to specific materials in the record, including affidavits, depositions, declarations, and interrogatory answers.  Fed. R. Civ. P. 56(c).  Unsupported conclusions and factual allegations are insufficient to create a genuine issue of material fact.  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  Also insufficient are allegations based on speculation.  *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005).  *See also Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996) ("[U]nsubstantiated assertions alone are not enough to withstand a motion for summary

judgment.").  Finally, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  *Anderson*, 477 U.S. at 247–248.  In reviewing a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant."  *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 707 (11th Cir. 2019).

## II.  FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY

A.  Grant's Employment

Grant, an African American female, was hired as an art teacher at Wetumpka High School in Elmore County, Alabama in 1997.   (Doc. No. 51-30 at 2.)  During the second semester of each school year, the superintendent of the Elmore County Public Schools District sends a memorandum to all county teachers to inquire whether they intend to resign, retire or return to teaching the following school year.  Grant understood that the school district needed to know which employees were returning the following year for

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including Grant's deposition transcript excerpts and exhibits thereto (Doc. No. 51-1; Doc. No. 57-4; Doc. No. 57-5; Doc. No. 57-7; Doc. No. 57-9; Doc. No. 57-10; Doc. No. 57-11); Grant's Affidavit and attachments (Doc. No. 57-2); Richard Dennis' deposition transcript excerpts (Doc. No. 51-18); Richard Dennis' Affidavit and exhibits thereto (Docs. No. 51-32 through 51-36); Dana James' deposition transcript excerpts and exhibits thereto (Docs. No. 51-20 through 51-27; Doc. No. 57-8); Dana James' Affidavit (Doc. No. 51-44); Robert Slater's deposition transcript (Doc. No. 51-19); Robert Slater's Affidavit (Doc. No. 51-46); and exhibit to deposition of Elmore County School Board President Michael Morgan (Doc. No. 51-30 at 2).  As it must when ruling on a motion for summary judgment, this Court views this evidence in the light most favorable to Grant, the non-movant, and draws all justifiable inferences in her favor. *Anderson*, 477 U.S. at 255.

planning purposes.  (Doc. No. 51-1 at 45.)  From 1998 through 2006, Grant responded that she planned to continue teaching.  (Doc. No. 51-51 at 12-20.)  In February 2007, she responded that she would resign before the 2007-2008 school year.  (*Id*. at 11.)  However, on May 22, 2007, Grant submitted a letter informing the School District that she would not be resigning and that she was "recanting [her] intention form."  (Doc. No. 51-50; Doc. No. 51-1 at 13-14, 47-48.)  Grant explained that in May 2007, Assistant Superintendent James Myers called to ask if she still intended to resign as stated in her February notice.  (Doc. No. 51-1 at 47-48.)  Thus, Myers' inquiry prompted Grant to write the letter rescinding her resignation.  (*Id*.)

Between 2008 and 2016, Grant consistently informed the district that she would return for the following year.  (Doc. No. 51-51 at 2-10.)  On February 7, 2017, Grant signaled that she would not return for the next school year by checking the option indicating "I plan to retire at the end of the 2016-2017 school year."  (*Id*. at 1.)  The memorandum instructed the teachers to attach a letter if they selected the retirement option.  (*Id*.)  On February 8, Grant wrote a letter affirming her "plan" to retire at the end of the 2016-17 school year.  (Doc. No. 51-5.)

Superintendent Richard Dennis ("Dennis") explained that when his office receives word that an employee intends to retire, that person's name is submitted to the Elmore County Board of Education (the "Board") for approval, after which the superintendent advertises and fills the vacated slot as soon as possible.  (Doc. No. 51-18 at 10-11.)  Grant's name was among several candidates for retirement listed on a Personnel Action Sheet for

the Board's approval during its meeting of March 27, 2017.[2]   (*Id*. at 11; Doc. No. 51-35.)
According to Dennis, his office does not notify employees that their names would be placed
on the Board's agenda for personnel actions and Grant's name was submitted to the Board
because she submitted a letter to its human resources department.  (Doc. No. 51-18 at 13-
14.)    The minutes from the Board's March meeting show that it approved the
superintendent's recommendation on all proposed personnel actions.  (Doc. No. 51-7 at 2.)
The Personnel Action Sheet listed Grant's effective retirement date as May 26, 2017.  (*Id*.)
Once the Board approved the Personnel Action Sheet, its Payroll Coordinator Dana James
("James") entered the information for each retiree into a database maintained by the
Teachers' Retirement System of Alabama ("RSA").  (Doc. No. 51-44 at ¶¶ 2-3; Doc. No.
51-20 at 15.)  James recalled entering Grant into the RSA portal as voluntarily terminated
with an effective date of May 26, 2017.  (Doc. No. 51-20 at 13, 15-16.)  She noted that
some retirees disfavor the word "terminate," but in distinguishing between "termination of
employment" and "termination of benefits," James explained that the latter context was the
operative one for purposes of providing retirement information to RSA.  (*Id*. at 13.)

On March 29, 2017, two days after the Board approved Grant's retirement, James
emailed Grant to ask whether her retirement paperwork had been submitted.  (Doc. No. 51-
22.)  On March 31, Grant submitted her application for retirement with an effective date of
June 1, 2017 and James forwarded the material to RSA on or about April 3.  (Doc. No. 51-
44 at ¶ 4; Doc. No. 51-1 at 44; Doc. No. 51-6.)  The RSA form offered two options for

---

[2] Grant was one of nineteen retiring employees listed.  Grant and six other employees were
African-American and twelve were Caucasian.  (Doc. No. 51-35.)

retirement – service or disability, which required the submission of a Report of Disability packet.  (Doc. No. 51-6.)  Grant's application had an "x" in the box next to service retirement.[3]  (*Id*.)  On April 7, David Seal of RSA emailed James to inform her that Grant, at 61 years of age, lacked the age and time in service to qualify for service retirement and that disability retirement was her only option.  (Doc. No. 51-23.)  On April 10, Amy Crews ("Crews"), an RSA retirement counselor, sent Grant a letter informing her that her request for disability retirement could not be processed without a Physician's Report of Disability.[4]  (Doc. No. 51-8.)  Crews attached the necessary form to the letter and explained that unless it was completed and received or postmarked by May 2, 2017, Grant's effective date of retirement, June 1, would be delayed.  (*Id*.)

On May 5, 2017, Crews sent another letter informing Grant that her failure to respond to the previous request for documentation meant that her earliest retirement date was now July 1, 2017.  (Doc. No. 51-9.)  Crews also conditioned the July retirement date upon RSA's receipt of the Physician's Report of Disability by June 1.  (*Id*.)  Dr. John Jernigan completed a disability form for Grant on April 28.  (Doc. No. 51-15 at 8-9.)  Dr. Jernigan wrote that reasonable accommodations were possible for Grant to continue

---

[3] James testified that she did not mark "Service Retirement" on Grant's application and that to the best of her recollection, that box was already checked when she received the form.  (Doc. No. 51-20 at 14.)  James also did not discuss Grant's application with any other person in her office, including Superintendent Dennis.  (*Id*. at 10.)  According to James, her office does not provide assistance or counseling in the retirement application process, as their function is limited to completing an employer certification and inputting the retiring employee's information into the RSA portal.  (*Id*. at 15, 17.)

[4] Crews copied James at the Elmore County Board of Education on all of her letters to Grant.

working and that she was not totally incapacitated for further performance of her job duties. (*Id.* at 8, 9.)  Crews received Jernigan's medical assessment on May 18 and wrote Grant on May 19 to inform her that, according to Dr. Jernigan, she was neither permanently disabled nor totally incapacitated to perform her job duties.  (Doc. No. 51-10.)  Crews provided Grant with another Physician's Report of Disability with instructions to return it to RSA within thirty (30) days.  (*Id.*)  On June 8, Crews wrote Grant to say that her failure to meet RSA's deadlines for documentation meant that she needed to resubmit her retirement application and another Physician's Report of Disability between 30 and ninety days prior to her effective date of retirement.  (Doc. No. 51-11.)

On June 17, 2017, Dr. Jernigan completed a second Physician's Report of Disability based upon his examination of Grant on May 17.  (Doc. No. 51-53.)  Dr. Jernigan did not provide an opinion on whether Grant was totally incapacitated for further job duties, rather, he indicated that no reasonable accommodation could be made to enable her to continue teaching.  (*Id.* at 1, 2.)  On July 5, James emailed Crews to clarify that Grant was not on a leave of absence and was "just terminated."[5]  (Doc. No. 51-24.)  James added "I have tried and tried to explain this to her but she doesn't get it."  (*Id.*)  That same day, Crews wrote Grant to acknowledge receipt of Jernigan's second medical opinion on June 22.  (Doc. No. 51-12.)  The letter explained that Grant was ineligible for retirement because she was not

---

[5] James testified that this email was likely in response to a telephonic inquiry from Crews regarding Grant's status.  (Doc. No. 57-8 at 45-46.)  She explained that if Grant were on a leave of absence, her application could have been processed by RSA.  (*Id.* at 48-49.)  James recalled alerting Slater to the difference such status would have had on Grant's disability application and that he should "make sure that [Grant] realize[d]" that, given the delays in her paperwork, "she could not get disability retirement if she was not on a leave of absence."  (*Id.* at 51.)

on a leave of absence and had "terminated employment with Elmore County Schools." (*Id.*)  Crews also informed Grant that if she met the in-service requirements for disability retirement she could reapply.  (*Id.*)

On July 26, 2017, Grant sent an email and letter to James.  (Doc. No. 51-25; Doc. No. 51-26.)  Each stated that she learned from Crews on that date that she was no longer employed by the Elmore County Schools.  (*Id.*)  She asked that her termination be rescinded so that RSA could process her retirement application.  (*Id.*)

Although Grant conditioned her retirement on approval of her disability application by RSA, she did not make that contingency known to anyone at the Board.  (Doc. No. 51-1 at 32; Doc. No. 57-5 at 2.)  She recalled that in early May, Dr. Robert Slater ("Slater"), principal at Wetumpka High School, came to her classroom and told her that the Board was going to have a call meeting and he needed to know her intentions for the next year. (Doc. No. 57-7.)  Grant told him that she planned to retire on disability and Slater said to her "well, why don't you just resign."[6]  (*Id.*)  Grant stated that a friend who attended all Board meetings told her in May 2017 that the Board approved her retirement during its meeting that month.  (Doc. No. 51-1 at 20-21.)  Once Grant learned from her friend that

---

[6] Grant places this conversation alternatively "around the first of May" (Doc. No. 57-7) or on May 8 (Doc. No. 51-1 at 32).  Slater says that he would have had a conversation with Grant, as opposed to a meeting, regarding her form submission "closer to the time of turning the form in."  (Doc. No. 51-19 at 10.)  He does not recall suggesting that she resign or asking if she was "really leaving" at any time.  (*Id.*)  Slater explained  that he would not have needed information from Grant regarding her retirement plan in May of 2017 because the Board approved her retirement at its March 2017 meeting.  (Doc. No. 51-46 at ¶ 9.)  Slater also testified that while he knew Grant was applying for disability retirement, it was not his understanding that her retirement was conditioned upon the approval of her disability application by RSA.  (Doc. No. 51-19 at 13-14.)

her retirement was approved by the Board, she began to wait for RSA to process her paperwork and for her physician's forms to be completed and submitted.  (*Id*. at 21.)

Despite regarding her retirement as contingent upon approval of her disabled status and Dr. Jernigan's opinion in April 2017 that she was able to work, Grant never communicated to anyone at the Board that she desired to rescind her retirement notices. (*Id*. at 33-35.)  Grant did not believe she needed to inform anyone at the Board that she wanted to remain on its payroll because James had been copied on all of Crews' letters and therefore, the Board knew that her disability application was unsuccessful.  (*Id*. at 34.) After receiving Crews' letter of July 5, she did not reach out to the Board to attempt to reverse its approval of her retirement or in some way appeal its vote approving her retirement.  (*Id*. at 40-41.)

Grant did not seek employment with the Elmore County Board of Education or any other public school system so that she could become eligible for disability retirement.  (*Id*. at 37.)  In fact, Grant stated that she expected James or someone at the Board to contact her regarding the rescission of her notice of retirement, as Assistant Superintendent Myers had done in 2007.  (*Id*. at 47-48.)  While she acknowledged that her original plan was to retire at the end of the 2016-2017 school year, her plan changed because her retirement was contingent upon "if and when [her] disability went through."  (Doc. No. 57-5 at 1-2.) Grant viewed her February notice as "only a statement of intent of plan to retire at the end of the 2016-2017 school year and not an unequivocal statement of immediate voluntary retirement and or resignation."  (Doc. No. 57-2 at ¶ 4.)  According to Grant, she did not submit an affirmative resignation letter to the Board and thus believes that she was fired.

9

(*Id*. at ¶ 5; Doc. No. 51-1 at 8, 23, 37, 43.)  In her own words, her claim for disability is based upon being "fired, terminated, before [her] papers were processed after serving for 20 years." (*Id*. at 23.)

On or around June 1, 2017, when Grant was at Wetumpka High School to finish cleaning out her classroom, she met the new art teacher who was hired in anticipation of her departure.  (Doc. No. 51-1 at 16, 28.)  Grant observed that the new teacher was Caucasian but denied that her replacement was a "substantially younger person." (*Id*. at 28.)

B.    EEOC Charge

Grant filed a charge letter with the Equal Employment Opportunity Commission ("EEOC") on November 10, 2017.  (Doc. No. 51-16.)  Her complaint alleged discrimination and retaliation based upon race, sex, age, and disability. (*Id*. at 1.)  By letter dated October 15, 2018, the EEOC notified Grant that it was unable to conclude that the Board discriminated against her, and that she had ninety days from receipt of the notice to file a federal or state lawsuit related to her claims.  (Doc. No. 51-17 at 1.)

Grant stated during her deposition that she did not know when she received the EEOC notice in the mail.  (Doc. No. 51-1 at 39.)  She later attested for purposes of her response to the motion for summary judgment that she received the EEOC Dismissal and Rights letter in the mail on October 20, 2021.[7]  (Doc. No. 57-2 at ¶ 2.)

---

[7] Grant's affidavit attaches a printout of her October 24, 2018 email to her attorney informing him that she received the EEOC letter on October 20 and would like to discuss the matter with him. (Doc. No. 57-2 at 3.)  Defendants assert that Grant did not produce this email in discovery.

C.     Complaint

On January 17, 2019, Grant filed an eight-count Complaint alleging racial discrimination and retaliation against her by the Board and its members in their official and individual capacities, as well as Superintendent Dennis in his official and individual capacities (collectively "Defendants").[8]   (Doc. No. 1 at ¶¶ 7-15.)   Count One of the Complaint alleges racial discrimination by the Board in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, *et seq*.), due to Grant's termination. (*Id*. at ¶¶ 48-55.)   Count Two alleges discrimination by the Board on the basis of Grant's disabilities, i.e., bursitis, hypertension, diabetes, osteoarthritis, anxiety, and depression, due to Grant's termination, in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq*.  (*Id*. at ¶¶ 57-72.)   Count Three alleges disability discrimination by the Board due to Grant's termination, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 710, *et seq*.  (*Id*. at ¶¶ 73-78.)   Count Four alleges age discrimination by the Board due to Grant's termination, in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq*.   (*Id*. at ¶¶ 79-85.)   Count Five alleges that Grant's termination was intentional race discrimination by all defendants, in violation of 42 U.S.C. § 1981.  (*Id*. at ¶¶ 86-98.)   Count Six alleges that all individual defendants acted under color of state law to deprive Grant of her opportunity to be heard, in violation of her right to petition the government for the redress of grievances, and that such violation is actionable under the First Amendment to the United States Constitution through 42 U.S.C.

_____

[8] The Board members are Dale Bain, David Jones, Leisa Finley, Wendell Saxon, Michael Morgan, Kitty Graham and Joel Holley.  (Doc. No. 1 at ¶¶ 9-15.)

§ 1983. (*Id*. at ¶¶ 99-106.) Count Seven alleges that all individual defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by depriving Grant of notice and an opportunity to be heard prior to her termination, and that such violation is actionable through 42 U.S.C. § 1983. (*Id*. at ¶¶ 107-121.) Count Eight alleges that all individual defendants violated the Equal Protection Clause of the Fourteenth Amendment by treating Grant differently than similarly situated White employees of the Board, and that such violation is actionable through 42 U.S.C. § 1983. (*Id*. at ¶¶ 122-129.)

Grant seeks the following relief:

1. A declaratory judgment that Defendants violated her rights under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, as amended, the ADA and the Rehabilitation Act;

2. An order enjoining Defendants and all persons acting in concert with them from engaging in discriminatory employment practices on the basis of race and retaliation;

3. A preliminary injunction and permanent injunction enjoining Defendants, and those acting in concert with them and at their request, from continuing to violate Title VII;

4. An order requiring Defendants to make Grant whole by immediately reinstating her to her previous position of employment with the Board, which she would have had in the absence of discrimination based upon her race, disability, age, and constitutional rights, back pay (plus interest), front pay, declaratory and injunctive relief, liquidated damages, compensatory and punitive damages, lost seniority, lost healthcare and other fringe benefits, lost retirement, and non-probationary status under applicable Alabama law; and

5. Other such relief and benefits including, but not limited to, costs, attorney's fees, and expenses.

(*Id*. at 21-22.)

D.    Motion for Summary Judgment

Defendants filed a Joint Motion for Summary Judgment on all claims.[9]  (Doc. No. 50.)  Their brief in support argues that Grant's claims under Title VII (Count One) and the ADEA (Count Four) are untimely and due to be dismissed due to her failure to file this action within ninety days of her receipt of the EEOC's Notice of Rights letter.  (Doc. No. 52 at 23-25.)  Defendants also contend that Grant cannot establish a *prima facie* case of race discrimination for purposes of Title VII, § 1981, or § 1983 as alleged in Counts One, Five and Eight (*id*. at 25-33), or a *prima facie* case of age discrimination under the ADEA as alleged in Count Four (*id*. at 41-44).  Beyond these substantive issues of liability, Defendants argue that the official capacity claims against the individual defendants are due to be dismissed as duplicative and, because they enjoy the protection of the qualified immunity doctrine, they are entitled to summary judgment in their individual capacities. (*Id*. at 57-64.)

Grant responds that her claims under Title VII and the ADEA were timely filed based upon the date she received the EEOC Notice of Rights.  (Doc. No. 57-1 at 9.)  She submits that she has established a *prima facie* case for race discrimination under Title VII (*id*. at 10-12) and age discrimination (*id*. at 16).  In support of her *prima facie* case, Grant submits that she suffered an adverse employment action when she was terminated and that

---

[9] Grant's Response in Opposition to Defendant's Motion for Summary Judgment concedes that no genuine issue of material fact exists as to Counts Two, Three, Six and Seven, and that Defendants are entitled to summary judgment on those claims.  (Doc. No. 57-1 at 17.)  For purposes of brevity, the Court will limit its discussion to the remaining allegations of racial discrimination in Counts One, Five and Eight, and age discrimination in Count Four.

she was treated less favorably than similarly situated employees outside of her protected class.  (*Id*. at 11-12.)  Grant rejects Defendants' argument that her employment was terminated for legitimate and nondiscriminatory reasons and argues that, because she has demonstrated pretext, her case presents issues of material fact that can only be decided at trial.  (*Id*. at 12-16.)  Further, Grant rejects Defendants' claim of qualified immunity as to the § 1983 claim, arguing that the doctrine should not apply to cases of race discrimination which violate clearly established law because the doctrine exists to allow government officials to make difficult decisions in areas of legal uncertainty.  (*Id.* at 17.)

Grant's Response does not include argument in support of her claims under 42 U.S.C. §§ 1981 and 1983.  While Defendants ask the court to consider these claims abandoned, they note the Eleventh Circuit applies the same elements of proof to claims of employment discrimination under Title VII and §§ 1981/1983.  (Doc. No. 58 at 5, n.3 (citing *Rodemaker v. Shumphard*, 859 F. App'x 450, 451-52 (11th Cir. 2021).)  Because the analysis for these claims are the same, the Court's evaluation of Grant's Title VII claim will also apply to her §§ 1981 and 1983 claims which she did not address.

### III.   JURISDICTION AND VENUE

This Court exercises subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e-5(f)(3).  The parties do not contest personal jurisdiction or venue, and the Court finds sufficient allegations to support both in the Middle District of Alabama.

## IV.   DISCUSSION

A.      Motion for Summary Judgment

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 similarly prohibits intentional discrimination based on race in the employment context.  *See* 42 U.S.C. § 1981(a); *Ferrill v. Parker Grp., Inc.,* 168 F.3d 468, 472 (11th Cir. 1999).  Section 1983, which provides a private cause of action against a state actor who violates federal constitutional or statutory rights, provides the exclusive remedy for a violation of § 1981 by a state actor.[10]  *See* 42 U.S.C. § 1983.  *See Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009) ("[Section] 1981 does not provide [a] cause of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981.").

"Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  Hence, "the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same.

_____

[10] Defendants do not dispute that they are state actors for purposes of § 1983.  (Doc. No. 52 at 56.) They do condition liability under § 1983 on a plaintiff's showing that either (1) an official policy or (2) an unofficial custom or practice caused the harm complained of.  (*Id*. (citing *Grech v. Clayton Cnty., Ga*., 335 F.3d 1326, 1329-30 (11th Cir. 2003)).)

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Abel v. Dudderly*, 210 F.3d 1334, 1338 (11th Cir. 2000)); *see also Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.").[11]

> 1. Framework and Analysis for Title VII Disparate Treatment and § 1983 Racial Discrimination Claims

"In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019).  "A plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012) (citing *Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008)).  Absent direct evidence, "[c]ourts assess circumstantial evidence of discrimination through the three-part burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  Under the framework established for Title VII race discrimination claims, "the plaintiff bears the initial burden of establishing a *prima facie*

---

[11] Generally, courts use the same legal framework to analyze employment discrimination claims under Title VII, § 1981, and § 1983, but the Supreme Court has held recently that a plaintiff in a § 1983 action for a violation of § 1981 must "initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, __ U.S. __, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020); *Rodemaker v. Shumphard*, 859 F. App'x at 451-52.  Grant has not carried her burden in this case due to a failure to show sufficient evidence to prove that race was a but-for cause of her termination.

case of intentional discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220-21; *Tamba v. Publix Super Mkt.*, 836 F. App'x 765, 771 (11th Cir. 2020) (applying *McDonnell Douglas* framework to racial discrimination claims under Title VII and § 1981); *Abbes v. Embraer Services, Inc.*, 195 F. App'x 898, 900 (11th Cir. 2006) (citing *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)).   When a plaintiff makes her *prima facie* case of discrimination, a presumption of unlawful discrimination is created, but "the employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).   If the defendant proffers a non-discriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual.   *Id.*

Defendants assert that Grant has not established a *prima facie* case of discrimination under Title VII because she has not shown an adverse action or favorable treatment of a comparable employee.  (Doc. No. 52 at 27-32; Doc. No. 58 at 6-10.)  The Court agrees.

      a. Because Grant initiated her retirement, she did not suffer an adverse employment action.

"A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Arrington v. Ala. Power Co.*, 769 F. App'x 741, 747 (11th Cir. 2019) (quoting

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)); *Tamba*, 836 F. App'x at 771.  This means that Grant must "establish an 'adverse employment action' by proving that a decision of the employer 'impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way.' " *Jefferson*, 891 F.3d at 920-21 (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington Northern v. White*, 548 U.S. 53 (2006)).  Here, Grant has not shown that any decision by the defendants caused "a <u>serious and material</u> change in terms, conditions, or privileges" of her employment.  *Jefferson,* 891 F.3d at 921.  The Court addresses the evidence on whether Grant suffered an adverse employment action below.

Grant contends that she was fired.  (Doc. No. 51-1 at 8, 23, 37, 43.)  However, the record shows that Grant set in motion the events which resulted in her retirement.[12]  Grant understood that the annual memorandum from the school superintendent asking Elmore County teachers whether they would return the following school year enabled the system to identify upcoming vacancies, advertise those positions, and hire as needed.  (Doc. No. 51-1 at 45.)  Her February 7 response to the superintendent's 2017 canvas indicated that she would retire and on the following day, February 8, she provided the requested letter that affirmed her choice as indicated on the memorandum.  (Docs. No. 51-4, 51-5.)  While Grant's testimony and affidavits make clear that she conditioned her retirement upon

---

[12]  Defendants dispute that Grant was "terminated."  Their Supplemental Responses to Grant's interrogatories make a distinction between termination and the retirement initiated by her communications of February 7 and 8 which informed the Board that she intended to retire.  (Doc. No. 51-30 at 2.)  Testimony from James supports Defendants' hesitation to use the word "terminate" in relation to Grant's retirement.  (Doc. No. 51-20 at 13, 15-16.)

RSA's approval of disability retirement, she admits that she did not communicate that contingency to Slater, Dennis, or the Board. (Doc. No. 51-1 at 32.) Grant's argument that her memo response and accompanying letter merely informed Dennis and human resources that she only "planned" to retire is unavailing. This is so because Grant knew that the school system used the teacher responses to plan teaching needs for the upcoming year. Grant also knew from past experience, i.e., the rescission of her 2007 retirement notice, that it was incumbent upon her to take some action to continue her employment with the Board. (Doc. No. 51-1 at 45, 47-48.) The fact that Grant took the action necessary to keep her job in 2007 demonstrated her awareness that some affirmative, corrective action was required to remain employed by the Board.

Grant also asserts that she expected to be contacted by someone at the Board toward the end of the school year to confirm that it was still her plan to retire, as Assistant Superintendent Myers had done in 2007. (Doc. No. 51-1 at 47-48.) The record shows however, that expectation was not consistent with the Board's retirement process in 2017. Dennis testified that it was the Board's custom and practice to act upon teachers' notices of resignation or retirement, with no additional communication, by placing the names of persons giving notice of retirement or resignation before the Board for personnel action. (Doc. No. 51-18 at 13-14.) In 2017, those names were put before the Board on March 27 for approval. (*Id*. at 10; Doc. No. 51-32 at ¶ 8.) On March 29, James contacted Grant regarding the submission of her retirement package to RSA. (Doc. No. 51-22.) Grant provided the requested package to James on March 31. (Doc. No. 51-44 at ¶ 4.) By the time she received Crews' letter of May 5, Grant was aware that her earliest effective

retirement date was July 1.  (Doc. No. 51-9.)  Also, as of May 5, her physician rated her able to work.  (Doc. No. 51-52.)

Whether Grant's need for continued employment could have been accommodated by the Board is not before the Court because Grant did not try to prolong her employment after submitting her intent form and letter in February.  The Eleventh Circuit assesses the voluntariness of an employee's resignation by evaluating (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice she was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.  *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).  The facts underlying Grant's retirement from Wetumpka High School support a finding that her submission of the intent form was voluntary and, given her prior intent to resign in 2007, she understood the nature of her choices as she was aware that she would be removed from the payroll absent a rescission.  Further, as a long time school employee, she knew that the school gathered information on its needs for the following year in February.  Considering the totality of the circumstances, the *Hargray* factors lead the Court to find Grant's separation from employment was the natural result of her own action and did not constitute an adverse employment action.

> b. Grant has not identified a comparable employee who was treated more favorably.

Even if Grant could identify an adverse action, she has not established a *prima facie* case of race discrimination due to a lack of similarly situated comparators.  *Flowers v.*

*Troup Cty., Ga. Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015).  Grant does not identify a comparable employee who was treated more favorably than she for purposes of her *prima facie* case.  (Doc. No. 57-1 at 12.)  Defendants submit, and the Court agrees, that a true comparator employee would be one who gave a notice of intent to retire and was then removed from the Board's payroll before RSA processed that employee's application.  (Doc. No. 52 at 33; Doc. No. 58 at 10-11.)  Grant's own testimony suggests these are the characteristics of an appropriate comparator, as she stated "[m]y claim . . . is that I was fired, terminated, before my papers were processed . . . ."  (Doc. No. 51-1 at 23.)

An employee "must prove that he and his comparators are 'similarly situated in all material respects.' "  *Tamba*, 836 F. App'x at 771.  Additionally, the employee and comparator "must have been engaged in the same basic conduct and subjected to the same work rules."  *Id*.  Here, Grant asks the court to consider the testimony of James regarding inconsistencies between statements by Slater and James.[13]  (Doc. No. 57-1 at 14.)  Because James had knowledge of Grant's insufficient medical documentation and rapidly shrinking timeframe to qualify for disability retirement while still employed by the Board (due to having been copied on Crews' letters to Grant), she asked Slater to warn Grant that her window for disability retirement was shrinking.  (Doc. No. 57-8 at 51.)  Slater told James that he was confident that Grant intended to retire no matter the circumstances and did not act upon James' suggestion.  (*Id*.)  Slater's recollection of his interactions with Grant on

---

[13] Although Grant submits James' conversation with Slater to indicate inconsistencies for purposes of demonstrating pretext, the Court believes it is useful in showing that Grant has not identified a comparable employee for purposes of her *prima facie* case.

the issue of her retirement corroborate James' account, as he testified that Grant "made it clear that she was going to get [her disability retirement] done at the end of the year." (Doc. No. 51-19 at 14.)  Further, Grant confirmed that Slater would not have known that her retirement was conditioned upon the outcome of her disability application.  (Doc. No. 51-1 at 32.)  Apparently, James' position as Payroll Supervisor at the Board put her in a position to know whether problems arose in any retiring employee's application to RSA. James provided no evidence, however, that other employees encountered difficulty in the RSA application process but were kept on the Board's payroll while Grant was not.

Superintendent Dennis was unequivocal in his position that employees who submit retirement notices to the Board's human resources department do not receive any additional notice regarding the processing of their retirement.  (Doc. No. 51-18 at 14.)  James also stated that it is not her job to provide advice on issues concerning retirement.  (Doc. No. 51-20 at 17.)

Because there is no evidence in the record which shows that another potential retiree was contacted after submitting their notices or kept on the payroll while Grant was not, the Court finds that she has not established a similarly situated employee outside of her protected class for purposes of meeting the second *prima facie* element of her Title VII claim.  Accordingly, in consideration of all the evidence before the Court, viewed in the light most favorable to Grant, the Court concludes that Defendants' motion for summary judgment is due to be granted as to Grant's claims of race discrimination.[14]

---

[14] As discussed above, this outcome as to Grant's Title VII claim also applies to her claims of racial discrimination under 42 U.S.C. §§ 1981 and 1983.  *See* Part II. D., *supra*.

2.   Framework and Analysis for Discrimination Under the ADEA

An employer violates the ADEA when it fires employees who are forty years or older on the basis of their age. 29 U.S.C. § 623(a)(1); *Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). "A plaintiff must establish that her age was the 'but-for' cause of the adverse employment action." *Liebman*, 808 F.3d at 1298 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). As in Title VII cases, courts apply the *McDonnell Douglas* framework where a plaintiff's ADEA claim relies upon circumstantial evidence. *Liebman*, *id.*; *Keller v. Hyundai Motor Mfg.*, 513 F. Supp. 3d 1324, 1332 (M.D. Ala. 2021). In the Eleventh Circuit, a *prima facie* case of ADEA discrimination is made where the plaintiff shows (1) that she is a member of the protected group between the age of forty and seventy; (2) she was subject to an adverse employment action; (3) a substantially younger person filled the position from which she was discharged; and (4) she was qualified to perform the job from which she was discharged. *Keller*, 513 F. Supp. 3d at 1332 (quoting *Liebman*, 808 F.3d at 1298). As with Title VII cases, the presentation of a *prima facie* case shifts the burden of showing a legitimate, nondiscriminatory reason for the job action to the defendant, whereupon the plaintiff must demonstrate that the proffered reasons are pretextual.

For the reasons discussed above in the Title VII context, Grant cannot show that she experienced the adverse action required for her *prima facie* case under the ADEA. The Court contrasts the fact that Grant never made known that her retirement was conditioned on her disability and that her retirement should not have been implemented with the facts in *Harris v. Powhatan Cnty. Sch. Bd.*, 543 F. App'x 343 (4th Cir. 2013). In *Harris*, the

seventy-two year old African American plaintiff filled out his annual intent to return form by indicating that he wanted to return as a school district employee the following year. He submitted the form to the school district's financial director, who did not forward the form in the normal course of business, but instead told plaintiff that his position might be eliminated and that he should retire. When the divisional superintendent/supervisor of the plaintiff discussed retirement with him, plaintiff repeatedly conditioned it on receiving compensation for the annual leave he accrued, in excess of normal carry over limits, because the school district did not allow him to take summer vacations due to his responsibilities in preparing school facilities for the next school year. Despite being informed of plaintiff's conditions for retirement by the divisional superintendent, the school board approved the elimination of plaintiff's position as proposed by the financial director and divisional superintendent. *See Harris*, 543 F. App'x at 344-45. The Fourth Circuit concluded that because plaintiff consistently demanded that he would not retire without due compensation, a jury could conclude that plaintiff's increased age motivated the board's decision to eliminate his position, and that the claimed reason of a budgetary shortfall was pretextual. *Id*. at 348-49.

Here, Grant did not tell the Board employees responsible for implementing her retirement that it was conditioned upon the approval of her disability application to RSA. Because the Court has determined that Grant willingly submitted her request for retirement, she cannot demonstrate that she is no longer employed by the Board for any reason other than her voluntary submission of the form and letter notifying the Board that she wished to retire at the end of the 2016-2017 school year. *Hargray*, 57 F.3d at 1568. Applying the

*Hargray* factors to Grant's actions, the Court finds that because she voluntarily requested retirement, she cannot establish an adverse employment action as required for a *prima facie* case under the ADEA.

### 3. Immunity

In addition to defending Grant's § 1981 and § 1983 claims on the merits, Defendants assert they enjoy the protection of qualified immunity in their individual capacities. (Doc. No. 52 at 60-64.) Because the Court finds that Defendants did not violate Grant's constitutional rights, it pretermits discussion of Defendants' various claims of immunity.

### 4. Untimely Suit

Defendants urge the court to dismiss Grant's Title VII and ADEA claims with prejudice due to her alleged failure to file her Complaint within ninety (90) days of receipt of the EEOC Notice of Rights letter. (Doc. No. 52 at 23-25.) A plaintiff asserting a claim under Title VII or the ADEA must file her complaint within 90 days of her receipt of a right to sue letter. *Kerr v. McDonald's Corp.*, 427 F.3d 947, 051 (11th Cir. 2005); *Miller v. Georgia*, 223 F. App'x 842, 844 (11th Cir. 2007). Defendants argue that the Eleventh Circuit presumes that a mailing is received three days after issuance when the date of receipt is in dispute. (*Id*. at 24 (citing *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984)).) Here, Grant's testimonies and exhibits certainly place the date of receipt in dispute. During her deposition, Grant could not remember when she received the notice. (Doc. No. 51-1 at 39.) Her affidavit lists the date of receipt as October 20, 2021. (Doc. No. 57-2 at ¶ 2.) Finally, an email to her attorney states that she received the notice of rights on October 20, 2018. (*Id*. at 3.)

Defendants argue in their Reply that Grant's affidavit should be disregarded by the court as a contradiction of her deposition testimony.  (Doc. No. 58 at 4-5 (citing *Pete's Towing Co. v. City of Tampa, Fla*., 378 F. App'x 917, 919 (11th Cir. 2010).)  However, there is no pending motion that would allow the Court to fully consider those arguments. The Court has determined that without a formal motion, and at the summary judgment stage, it will adhere to its obligation to accept all facts in the light most favorable to the non-moving party and resolve all reasonable doubts in favor of the non-movant.  *Kroma Makeup EU, LLC*, 920 F.3d at 707.

## V.    CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Joint Motion for Summary Judgment (Doc. No. 50) is GRANTED.

A separate judgment will be entered.

DONE this 30th day of March, 2022.


_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE